**UNITED STATES, Appellee,**

v.

**BOHAI TRADING COMPANY, INC., A/K/A Brayco International Corporation, Defendant, Appellant.**

No. 94–1629.

United States Court of Appeals, First Circuit.

Jan. 30, 1995.

Daniel R. Deutsch, with whom Steven J. Brooks and Deutsch Williams Brooks De-Rensis Holland & Drachman, P.C., Boston, MA, were on brief, for appellant.

Jean L. Ryan, Asst. U.S. Atty., with whom Paul M. Gagnon, U.S. Atty., Concord, NH, was on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

■ Bohai Trading Company, Inc. ("Bohai"), a New Hampshire-based concern that causes athletic footwear to be manufactured overseas primarily for the account of others, appeals from the denial of its motion to dismiss two counts of an indictment charging that it trafficked in counterfeit goods in violation of 18 U.S.C. § 2320 and that it imported goods by means of false or fraudulent practices in violation of 18 U.S.C. § 542. The principal issue in this appeal is Bohai's argument that § 2320(d) is unconstitutionally vague. Because we find no such infirmity, we affirm.

## I.

### BACKGROUND [1]

In 1987 and 1988, Bohai [2] arranged for the overseas manufacture of sneakers for the Stride Rite Corporation ("Stride Rite"), the owner of the KEDS trademark. Stride Rite placed two separate orders with Bohai for the manufacture of 100,000 pairs per order of women's canvas vamp oxford ("CVO") sneakers bearing the KEDS mark. Bohai arranged for the shoes to be manufactured at the Qing Dao # 9 Rubber Factory, a government-owned enterprise in the People's Republic of China ("PRC"). Stride Rite terminated Bohai's authority to apply the KEDS mark to the shoes in the spring of 1989.

Beginning in August 1989, Bohai's president, James L. Bryant, devised a plan to produce CVO sneakers bearing the KEDS mark in the PRC and distribute them in the United States without the knowledge or authorization of Stride Rite. Bohai arranged for the production of the shoes at the PRC factory. In September 1989, a United States-based purchaser agreed to buy 100,-000 pairs of the shoes but asked for assurances that they were not counterfeit. A Bohai employee showed the purchaser a purported Stride Rite purchase order for approximately 100,000 pairs of CVO shoes. However, the purchase order pertained to a separate, previous order of CVO shoes and had nothing to do with the shoes then being sold to the purchaser. The employee falsely represented that the shoes had been ordered and produced for Stride Rite, but that Stride Rite had rejected them. In fact, the shoes had not yet been manufactured and Stride Rite had no knowledge of the plan to produce or import them.

The Qing Dao factory produced the shoes and applied the KEDS mark to them. Bryant and others took steps to conceal the fact that trademarks had been applied to the shoes without the knowledge or permission of Stride Rite. In December 1989, Bryant instructed the PRC factory to stamp the shoes then being produced to falsely reflect a

---

1. In reviewing the district court's denial of a motion to dismiss, we take the factual allegations in the indictment as true. *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952); *United States v. Barker Steel Co.*, 985 F.2d 1123, 1125 (1st Cir.1993). In this case, the motion to dismiss initially challenged all five counts of the indictment and, therefore, the factual allegations contained in the entire indictment were properly before the district court. On this appeal, we review the motion to dismiss only as to counts one and three (as explained below, pursuant to a plea agreement, the district court granted the government's motion to dismiss the remaining counts). Because of this procedural setting, on this appeal we take as true the factual allegations contained in the entire indictment.

2. Some of the events described here involved Bohai's predecessor, Brayco International Corporation, Inc.

production date of 1988. Documents were also backdated.

In March 1990, the counterfeit shoes entered this country through Boston. The invoice presented to the U.S. Customs Service at the time of entry falsely indicated that the shoes had been manufactured pursuant to a valid Stride Rite purchase order and were intended to be delivered to Stride Rite or its consignee. After entry, an employee of Bohai directed the shipper to deliver the shoes to a warehouse in Holbrook, Massachusetts, rather than to the Stride Rite warehouse in New Bedford, Massachusetts. The employee explained to the shipping company that Bohai and Stride Rite were manufacturing the shoes together as a "joint venture" and, therefore, Bohai was an agent for Stride Rite. After the purchaser inspected the shoes, they were delivered to New Jersey, where they were sold to the public as authentic KEDS CVO shoes through a national department store chain. On March 27, 1990, Bohai received a wire transfer for $410,032 from the purchaser for the 100,000 shoes.

On April 29, 1993, a federal grand jury indicted Bohai, Bryant and Bohai's Treasurer, Herbert Chih–Lun Wang, under one count charging violations of 18 U.S.C. § 2320,[3] one count charging violations of 18 U.S.C. § 542,[4] two counts of conspiracy under 18 U.S.C. § 371,[5] and one count charging violations of 18 U.S.C. § 1957.[6] The defendants moved to dismiss the indictment on various grounds, including that § 2320 did not give them constitutionally adequate notice of the illegality of their acts. The dis-

trict court held a hearing and, in an order dated October 29, 1993, denied the defendants' motion. Negotiations with the government ensued. On February 17, 1994, Bohai entered a conditional plea of guilty under Fed.R.Crim.P. 11(a)(2) to the first and third counts of the indictment, which alleged violations of §§ 2320 and 542 respectively. The agreement expressly reserved Bohai's right to seek review of the denial of the motion to dismiss. The district court then granted the government's motion to dismiss all counts against Bryant and Wang and to dismiss the conspiracy and money laundering counts against Bohai. Following a sentencing hearing, the district court sentenced Bohai to probation and imposed a fine of $100,000 for violations of counts one and three. The district court also ordered Bohai to pay $100,000 in restitution to Stride Rite.[7] This appeal followed.

## II.

### DISCUSSION

Bohai argues that the district court erred in denying Bohai's motion to dismiss the indictment for two principal reasons: (1) 18 U.S.C. § 2320 is unconstitutionally vague; and (2) even if the statute is not constitutionally infirm, Bohai nonetheless lacked fair notice because of § 2320's legislative history and a then-existing Customs Service regulation issued pursuant to another statute. We address Bohai's arguments in order.[8]

3. 18 U.S.C. § 2320 provides that "whoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark" may be subject to fine and imprisonment.

4. 18 U.S.C. § 542 prohibits the importation of goods by means of false or fraudulent practices.

5. Counts two and four of the indictment alleged, respectively, conspiracy to traffic in counterfeit goods and conspiracy to import goods by means of false or fraudulent practices.

6. 18 U.S.C. § 1957 prohibits engaging in monetary transactions in property derived from unlawful activity.

7. Pursuant to the plea agreement, the restitution is in escrow pending this appeal. The agreement provides that if this court finds count one (charg-

ing under 18 U.S.C. § 2320) is legally invalid, the restitution and any interest will be returned to Bohai.

8. Bohai also challenges count three, which charges that Bohai knowingly and intentionally sought to import 100,000 pairs of shoes "bearing counterfeit (as defined in Title 18 U.S.C. Section 2320(d)) blue rectangular heel patches with the name 'KEDS' on them, by means of one or more material false statements ..." in violation of 18 U.S.C. § 542. As Bohai notes, the "indictment expressly ties [count three] to a violation of section 2320." Because we find no constitutional infirmity with regard to § 2320, Bohai's challenge to count three fails.

The due process clause of the Fifth Amendment requires that a criminal statute be sufficiently definite. The "requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). "The question is whether, looking at the statute in light of the facts of the case at hand, [it] provide[s] a constitutionally adequate warning to those whose activities are governed." *United States v. Buckalew*, 859 F.2d 1052, 1054 (1st Cir.1988) (quotations and citations omitted); *see also United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963) ("In determining the sufficiency of the notice a statute must of necessity be examined in light of the conduct with which a defendant is charged."). Our task, therefore, is to determine whether 18 U.S.C. § 2320 gave Bohai adequate warning that, as alleged in the indictment, "knowingly [using] counterfeit marks without the authorization of the holder of the right to use such marks" is unlawful. Our review is *de novo. See, e.g., United States v. Aguilar–Aranceta*, 957 F.2d 18, 21 (1st Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992).

Bohai argues that the phrase "at the time of the manufacture or production" as used in the so-called "authorized-use" exception to § 2320's definition of counterfeit goods [9] renders the statute unconstitutionally vague. Bohai specifically focuses on the word "production," arguing that it has "no core meaning" and that § 2320 leaves the reader helpless "to understand what aspect of the production process—i.e., creating, bringing about, furnishing, or yielding the goods in question—is relevant in dating the existence of generalized authority to use the mark on goods of the same type."

Bohai's statutory analysis suffers from extreme myopia. As we have observed in the past, statutes are not enacted on a piecemeal basis and, accordingly, should not be read that way. *See Little People's Sch., Inc. v. United States*, 842 F.2d 570, 573 (1st Cir. 1988). By broadening the focus and examining the phrase "at the time of manufacture or production" in the context of the entire authorized-use exception, *see, e.g., id.*, we think that Bohai's vagueness challenge cannot be sustained. Based on the plain language of the statute, we conclude that Congress intended, and made sufficiently plain, that this exception would be limited to those goods or services for which authorization existed during the *entire* period of production or manufacture. We focus on Congress's statement that authorization must exist "*at the time of* the manufacture or production in question ... for the type of goods or services *so manufactured or produced.*" Though perhaps not a model of the most exacting legislative craftsmanship, we think this language nonetheless makes clear beyond reasonable dispute that the authorization to use the mark must exist "at the time of," that is, from beginning of the production or manufacture up to and including the time at which

9. We set forth the relevant portion of 18 U.S.C. § 2320(d) with the "authorized-use" language underscored:

(d) For purposes of this section—
(1) the term "counterfeit mark" means—
(A) a spurious mark—
(i) that is used in connection with trafficking in goods or services;
(ii) that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; and

(iii) the use of which is likely to cause confusion, to cause mistake, or to deceive; or
(B) a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of the Lanham Act are made available by reason of section 110 of the Olympic Charter Act; *but such term does not include any mark or designation used in connection with goods or services of which the manufacturer or producer was, at the time of the manufacture or production in question authorized to use the mark for designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.*

the goods or services have been finally "manufactured or produced."

■ We believe that Bohai could reasonably understand from the statutory language that conduct charged in the indictment was not within the authorized-use exception. The government charges that Bohai was not authorized to apply the marks to 100,000 pairs of CVO shoes, conduct that falls squarely outside the statute's exception. Bohai asks us to consider the language in light of the "undisputed fact" that, in 1988, it had authority from Stride Rite to assemble raw materials, import sewing machines and molds, and train the Qing Dao workers to produce the KEDS CVO shoes.[10] For the reasons outlined above, the language of the statute cannot sustain Bohai's assertion that these activities alone constitute "production" within the meaning of the authorized-use exception. While Bohai's activities in 1988 might have been steps in the production process, the statute requires that authorization exist until production is complete. In short, on these facts, we do not think this language can be reasonably described as ambiguous, much less unconstitutionally vague.

■ Bohai makes the additional and somewhat novel argument that, even if the statute is not vague, Bohai lacked fair notice in light of the legislative history of § 2320 as well as a then-existing Customs Service regulation. We do not agree. As to legislative history, Bohai argues that it "is relevant insofar as it discloses no intention to criminalize the type of conduct at issue." Bohai then presents a lengthy examination of various non-statutory materials. As a general proposition, when a court finds "clear meaning in the unvarnished language of the statute, [it is] duty bound to honor that meaning." *Baez v. INS,* 41 F.3d 19, 24 (1st Cir.1994). Consequently, a court may seldom engage in a boundless exploration of unenacted legislative materials. *See id.; see also Laracuente v. Chase Manhattan Bank,* 891 F.2d 17, 23 (1st Cir. 1989) ("[A]bsent ambiguity in the statutory language, our inquiry is complete and ends with the plain language of the statute."). Bohai's use of nonstatutory materials demonstrates the wisdom of this rule. Bohai relies upon legislative history for the dubious proposition that it discloses no congressional intent to criminalize the activity at issue. Under the Constitution, Congress speaks through duly enacted bills and resolutions; as to legislation, there is no requirement that Congress memorialize anything, much less its intent, through unenacted non-statutory materials. Accordingly, Congress's failure to do so can hardly be cited as proof of a defendant's argument that it lacked fair notice.[11]

We also disagree with Bohai's analytical premise. On an appeal like this one, the issue is simply whether the statute, as enacted by Congress, gave sufficient notice that the conduct charged was proscribed. Once we have determined that the statute is constitutionally sufficient, our analysis ends. Bohai seeks to go a step farther and create uncertainty by referring to wholly extraneous matters. We are not so easily distracted. Thus, Bohai's exhaustive treatment of the Customs Service regulation, appearing at 19 C.F.R. § 133.21(c)(3), is also unavailing.[12]

---

10. On this point, the district court noted in its order that, although it was not alleged in the indictment, the government did concede that the defendants were *at one time* authorized to apply the KEDS trademark to shoes manufactured at the Qing Dao factory.

11. As Judge Harold Leventhal once observed, citing legislative history is akin to "looking over a crowd and picking out your friends." Patricia M. Wald, *Some Observations On the Use of Legislative History in the 1981 Supreme Court Term,* 68 Iowa L.Rev. 195, 214 (1983). Bohai seeks to add a new twist by looking over a crowd and not finding an enemy.

12. Prior to 1988, 19 C.F.R. § 133.21(c)(3), issued pursuant to Section 526 of the Tariff Act of 1930,

19 U.S.C. § 1526, provided that if "the articles of foreign manufacture bear a recorded trademark or tradename applied under authorization of the United States owner," then the Customs Service would not prevent importation. Bohai's fair notice argument is grounded in its assertion that the Customs Service had routinely admitted trademarked goods produced by "authorized manufacturers" without regard to the timing of the manufacture.

We do not agree with Bohai that *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300, supports the broad proposition that the "administrative practice of the agency principally charged with enforcing Section 2320 is significant in determining whether that section provided fair notice to Bohai." In *Grayned,* a First Amendment case, the Court

## III.

## CONCLUSION

Because we conclude that the language of 18 U.S.C. § 2320 is sufficiently definite so as to give fair notice to Bohai that the conduct alleged in the indictment was proscribed, the judgment of the district court is

**Affirmed.**

stated that, in the absence of an interpretation of the meaning of an anti-noise ordinance from the court below, it would "extrapolate its allowable meaning ... [by looking to] the words of the ordinance itself, to the interpretations the court below has given to analogous statutes and, per-haps to some degree, to the interpretation of the statute given by those charged with enforcing it." *Id.* (internal quotations and footnotes omitted). Thus, agency interpretations might provide some assistance in our own effort to arrive at the meaning of a statute, but they must at least relate to the statute at issue.