**UNITED STATES of America, Appellee,**

v.

**Alfred M. GABRIELE, Defendant, Appellant.**

**No. 94–1215.**

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1995.

Decided Aug. 23, 1995.

---

John A. MacFadyen, Providence, RI, for appellant.

William C. Brown, Atty., Dept. of Justice, with whom Sheldon Whitehouse, U.S. Atty., and Michael E. Davitt, Asst. U.S. Atty., Providence, RI, were on brief, for appellee.

SELYA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

Defendant Alfred Gabriele challenges various district court rulings underlying his convictions for participating in a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d) (1991), and for engaging

in six monetary transactions in criminally derived property, *id.* § 1957. We affirm.

# I

## BACKGROUND

This is the third and final installment in the appellate proceedings arising out of the extensive money laundering operation headed by Stephen Saccoccia from the mid–1980s until late 1991. The earlier proceedings are reported in *United States v. Saccoccia,* 58 F.3d 754 (1st Cir.1995), and *United States v. Hurley,* 63 F.3d 1 (1st Cir.1995). After Gabriele was indicted for alleged participation in the Saccoccia criminal enterprise, he stipulated to the facts established by the government at the two earlier trials involving Stephen Saccoccia and his codefendants. We relate only the background information material to Gabriele's involvement in the criminal enterprise.

The money laundering operation primarily functioned through precious metals companies controlled by Saccoccia and located in Los Angeles, New York, and Rhode Island. Colombian drug dealers transferred huge sums to the Saccoccia organization for laundering. Employing various techniques, such as purchases of gold and cashier's checks, the Saccoccia organization laundered the drug monies and funneled laundered funds back to Colombia by circuitous techniques (e.g., multiple wire transfers and interstate transportation). Some of the gold was delivered to Recovery Technologies, Inc. ("RTI"), a precious metals dealer located in Attleboro, Massachusetts, and controlled and operated by Gabriele. The gold was kept in a safe purchased by Saccoccia and installed at RTI with Gabriele's consent. At one point Ga-

briele prophetically observed in relation to the gold deliveries: "Steve [Saccoccia] is going to put us all in jail some day."

In the summer of 1991, after learning that two of his Rhode Island companies were under FBI video surveillance, Saccoccia pointed out the concealed surveillance cameras to Gabriele. Shortly thereafter, Saccoccia announced his intention to acquire RTI from Gabriele and hired Gabriele as his employee. Saccoccia then began to divert to RTI the cash and gold shipments which could no longer be delivered undetected to the two Saccoccia companies.

The deliveries to RTI were monitored by Saccoccia employees. Among the persons at RTI, Gabriele alone knew about, and participated in counting, the cash and gold shipments from Saccoccia. The shipments to RTI were recorded by Gabriele in coded language. The coded records were kept in the desk in Gabriele's private office, separate from all other RTI records.[1] During this period, Gabriele again voiced concern that Saccoccia "is going to put us all in jail."

From time to time Saccoccia instructed Gabriele to transfer the large sums of cash kept in the RTI safe. On various occasions Gabriele wired funds to designated banks at Saccoccia's direction or turned over funds directly to Saccoccia couriers who had been told to leave cash amounts for Gabriele. Saccoccia and Gabriele discussed their ongoing cash transactions in a coded conversation intercepted by the FBI in October 1991.

In due course, Gabriele was indicted on a RICO conspiracy charge, along with Saccoccia and others, and separately charged with engaging in eight monetary transactions involving criminally derived property. A jury convicted him of RICO conspiracy and six monetary transaction charges.[2]

---

1. The secret records kept by Gabriele related also to the so-called Saccoccia "pool account" at RTI. Normally, RTI would sell gold for a client, place the proceeds in the pool account, and immediately wire the funds directly to the client. The secret pool account records revealed, however, that the proceeds due Saccoccia remained in RTI's bank account for much longer periods of time, awaiting Saccoccia's instructions to wire the funds—frequently to third parties.

2. At trial, Gabriele contended that Saccoccia, a long-time RTI client, had been allowed to keep cash in the RTI safe because the security systems at Saccoccia's Rhode Island companies were temporarily off-line, and that the large amounts of cash he handled for Saccoccia were not uncommon in the precious metals industry. He maintained that the intercepted conversations were inconclusive and that the inculpatory testi-

## II

### *DISCUSSION*

Gabriele takes the district court to task on several rulings, which we discuss in turn.

### A. *Section 1957*

#### 1. *Mens Rea*

First, he claims that the *mens rea* element under section 1957 is unconstitutionally vague, *see, e.g., Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), and that the district court therefore erred in denying his pretrial motion to dismiss the section 1957 charges. The crux of the argument is that section 1957 is a rather novel statute, in that it criminalizes conduct by a person once removed from that of the person who generated the criminally derived property. Thus, he argues, the proscribed conduct is not likely to appear unlawful to an ordinary citizen.

Second, he contends that section 1957 is unconstitutional on its face, in that it chills legitimate business transactions because a prudent business person could never be sure how many suspicion-arousing "red flags" would be enough to lead a jury to infer that the person "knew" that a client or customer was engaged in criminal activity. Alternatively he suggests that persons engaged in' honest business dealings would be forced to rely on racial or ethnic stereotyping, as by refusing to do business with "known" criminals.

Section 1957(a) prohibits "knowingly engag[ing] in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity...." 18 U.S.C. § 1957(a). "Criminally derived property" is "any property constituting, or derived from, proceeds obtained from a criminal offense." *Id.* § 1957(f)(2). A defendant may not be convicted under section 1957(a) unless he knew that the transaction involved "criminally derived" property, *id.* § 1957(c), but he need not have known that the subject property was derived from "specified unlawful activity," *id.* The denial of a pretrial motion to dismiss criminal charges is reviewed *de novo.* *See United States v. Aguilar–Aranceta,* 957 F.2d 18, 21 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992).

First, given the prominent "red flags" that signaled the criminal nature of the Saccoccia money laundering operation to Gabriele (e.g., knowledge of government surveillance; evasionary tactics; large volumes of secreted cash), as well as the strong evidence of Gabriele's *mens rea* ("some day Stephen Saccoccia is going to put us all in jail"), the instant constitutional challenge to the "knowledge" requirement under section 1957 has the ring of desperation. *See United States v. Baker,* 19 F.3d 605, 614 (11th Cir. 1994) (rejecting comparable as-applied challenge to § 1957).

Second, the facial challenge to the statute is without persuasive force. Section 1957 is but another in a substantial line of federal criminal statutes whose only *mens rea* requirement is "knowledge" of the prior criminal conduct that tainted the property involved in the proscribed activity. *See, e.g.,* 18 U.S.C. § 2312 (prohibiting interstate transportation of automobiles "knowing the same to be stolen"); § 2313 (same, for receipt of such automobiles); § 2314 (criminalizing interstate transportation of goods "knowing the same to have been stolen, converted, or taken by fraud"). Thus, Gabriele's policy argument reduces to an attempt to second-guess the congressional decision to criminalize a particular type of "knowing" conduct.

Gabriele further claims that the district court erred in rejecting proposed jury instructions defining the section 1957 "knowledge" element with greater precision.[3] As

---

mony from other Saccoccia employees was unreliable.

**3.** Gabriele requested instructions (i) defining "knowing" as a "clear and certain perception of fact or truth," not a mere suspicion, Request No. 18; (ii) that he had *no duty to investigate* the legality of the Saccoccia enterprise, Request No. 19; and (iii) that he could not be convicted unless the jury found that he knew it was a criminal offense to engage in monetary transactions in criminally derived property, Request No. 18A (citing *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991)).

he did not adequately renew his objections to the charge prior to the time the jury retired to deliberate, *see* Fed.R.Crim.P. 30, we review for plain error. *See United States v. O'Connor*, 28 F.3d 218, 220–21 (1st Cir. 1994).[4]

■ The district court carefully instructed the jury that Gabriele could not be convicted unless he "knew that the money or property involved in [the particular] monetary transaction was obtained from the proceeds of some criminal offense," and that the "knowledge" element was not met merely by a finding that Gabriele "might have known," "should have known," or "could have known." Like terms denoting other *mens rea* elements, "knowledge" is not readily susceptible to a more precise definition than is derived from the connotation suggested by the term itself. Our review confirms that the district court instruction in all respects delineated the appropriate "knowledge" element for application by the jury. *See United States v. Noone*, 913 F.2d 20, 30 (1st Cir.1990) (refusal to give requested instruction not reversible error if instruction given was substantially correct and substantially covered defendant's request), *cert. denied*, 500 U.S. 906, 111 S.Ct. 1686, 114 L.Ed.2d 81 (1991).[5]

Finally, Gabriele contends that the jury instruction on "willful blindness" was error.[6]

Since the government adduced no evidence that Gabriele had engaged in any particular conduct for the purpose of precluding his acquisition of actual knowledge that Saccoccia was engaged in unlawful activities, Gabriele argues that the "willful blindness" instruction necessarily suggested that the jury could convict if it found that he "should have known" that the gold and cash he received from Saccoccia derived from criminal activity. Once again, we review for plain error.[7]

■ A willful blindness instruction is warranted if (1) the defendant claims lack of knowledge; (2) the evidence would support an inference that the defendant consciously engaged in a course of deliberate ignorance; and (3) the proposed instruction, as a whole, could not lead the jury to conclude that an inference of knowledge was mandatory. *See United States v. Brandon*, 17 F.3d 409, 452 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 80, 81, 130 L.Ed.2d 34 (1994); *United States v. Richardson*, 14 F.3d 666, 671 (1st Cir.1994). Gabriele concedes that the first and third elements were met but argues that the instruction was improper because the government failed to prove that though confronted with various "red flags," he nonetheless said "I don't want to know what they mean." He is mistaken, however. *See, e.g., id.* at 671 (finding no plain error in instruct-

---

4. Gabriele did not object to the definition of "knowing," following the jury charge. *See supra* note 3. Although he clearly delineated the grounds for objecting to numerous other jury instructions, *see infra* Section II.B.2, he simply renewed his objections to Requests 18A and 19 by reference. *See O'Connor*, 28 F.3d at 221 (under Fed.R.Crim.P. 30, party must *state* distinctly the grounds for objecting, and may not rely on previous written articulation of grounds).

5. Since the § 1957 *mens rea* requirement includes no "wilfulness" element, a *Cheek* instruction, *see supra* note 3, would have been improper as a matter of law. *See United States v. Brandon*, 17 F.3d 409, 448 (1st Cir.) (noting that requested instruction which includes an incorrect statement of the law should not be given), *cert. denied*, —— U.S. ——, 115 S.Ct. 80, 81, 130 L.Ed.2d 34 (1994).

6. The instruction stated, *inter alia:* "In deciding whether a defendant acted knowingly, you may infer that the Defendant had knowledge of a fact if you find that [he] deliberately closed his eyes to a fact that otherwise would have been obvious to

him." Further, the court cautioned the jury: "It's up to you to decide whether . . . this Defendant deliberately closed his eyes to a fact and, if so, *what inference should be drawn.* It's important, however, to bear in mind that mere negligence or mistake in failing to learn a fact is not sufficient." (Emphasis added.)

7. The following colloquy occurred at side-bar immediately after the jury charge:

[Defense counsel]: I specifically object to . . . the willful blindness, so-called conscious avoidance instruction. I incorporate by reference all of the argument that I made in support of that objection that was made at the conference, at the charge conference. Should I put them on the record or incorporate them by reference?
Court: Your arguments? You mean as far as incorporated that by reference?
[Defense counsel]: Thank you.

We have held that counsel must comply with the requirements of Rule 30 unless the district court expressly forbids it. *See O'Connor*, 28 F.3d at 221.

ing jury on "willful blindness" where evidence indicated that defendant had been presented with a succession of "flags of suspicion" in business dealings). There was no plain error in the district court instruction that "knowledge" could be inferred if the jury were to find that Gabriele consciously avoided the import of the conspicuous "red flags" involved here (e.g., government surveillance, large stores of cash, use of coded language).[8]

### 2. *Motion for Judgment of Acquittal*

■ The pre–1992 version of section 1957(f)(1) defined "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument ... by, through or to a financial institution (as defined in section 5312 of title 31)...." 18 U.S.C. § 1957(f)(1) (1988).[9] Gabriele contends that the government's evidence merely showed—as to five of the six counts of conviction under section 1957—that he *received* cash shipments from Saccoccia, counted and *held* them for safekeeping, then returned them through Saccoccia's emissaries. Although mere receiving and holding comes within the broader definition of "transaction" found in the *money laundering statute, see* 18 U.S.C. § 1956(c)(3) ("transaction" includes "*delivery* by, through, or *to* a financial institution") (emphasis added), Gabriele argues that the language of section 1957(f)(1) clearly contemplates something *more;* namely, evidence that the defendant in some manner further facilitated the laundering process itself; for example, by commingling a cash "deposit" with the financial institution's own funds, altering the *form* of the property de-

posited (e.g., by purchasing gold or a cashier's check), or transferring the deposit, or its proceeds, to third parties, as by wire transfer.

■ The denial of a Rule 29 motion for judgment of acquittal is reviewed *de novo* to determine whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt. *See United States v. Hernandez*, 995 F.2d 307, 311 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993).

Gabriele cites neither legislative history nor authority for the contention that the statutory term "deposit" was used in its specialized sense so as to reach only bank deposits.[10] The plain language of section 1957(f)(1) explicitly criminalizes the knowing acceptance of a "*transfer ... to*" a "financial institution," such as RTI, *see* 31 U.S.C. § 5312, knowing that the transfer involved criminally derived property. *See United States v. Bohai Trading Co.*, 45 F.3d 577, 581 (1st Cir. 1995). We see no significance in the fact that Congress chose to insert in section 1956(c)(3) an *illustrative* list of the types of covered "transfers," *id.* § 1956(c)(3) ("the term 'transaction' *includes* ... a transfer ... and with respect to a financial institution *includes* ...") (emphasis added), then chose not to repeat that list in the non-illustrative definition appearing in section 1957(f)(1) ("the term 'monetary transaction' *means* the deposit, withdrawal, or transfer ...") (emphasis added).

---

**8.** To the extent that Gabriele suggests that a willful blindness instruction was unwarranted because the government presented *direct* evidence of actual knowledge (viz., Gabriele's repeated statements about "jail"), we note that the jury was free to discredit the more direct evidence, yet find the requisite "knowledge" based solely on a reasonable inference of willful blindness.

**9.** RTI is a "financial institution" for § 1957(f)(1) purposes. *See* 31 U.S.C. § 5312(a)(2)(N) (term includes "a dealer in precious metals"). Gabriele's reply brief argues that these cash shipments were made "to him at RTI," not to RTI.

As Gabriele did not make this argument, either in the district court or in his opening brief on appeal, it is deemed waived. *See United States v. De Masi*, 40 F.3d 1306, 1312 (1st Cir.1994) (issues not raised in trial court cannot be raised on appeal); *id.* at 1318 (issues initially raised in appellate reply brief deemed waived).

**10.** Not only is there no indication that the term "deposit" was used in this specialized sense, but it is significant, we think, that non-conventional financial institutions, such as precious metals dealers—including RTI—were expressly covered by the statute.

■ Further, given its particular intention to target money laundering in these companion statutes, we see no basis for the conjecture that section 1957(f)(1) was intended to proscribe only the conduct of those transferees who actually "launder" the cash or other property deposited (i.e., effect an alteration in its form). The evidence in this case clearly established that Saccoccia arranged to "transfer" these large cash sums for the very purpose of having RTI hold the cash—safe from the recently discovered government surveillance at Saccoccia's two Rhode Island companies—for eventual laundering in the normal course. We think this evidence demonstrated "deposits" or "transfers" sufficient to satisfy the statute. For these reasons, the motion for judgment of acquittal was properly denied.

## B. *RICO Conspiracy*

### 1. *The "Conduct or Participate" Instruction*

Section 1962(c) makes it a criminal offense "for any person employed by or associated with any enterprise [affecting interstate commerce] to conduct or *participate, directly or indirectly, in the conduct of* such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (emphasis added). Gabriele argues that it was error to instruct the jury that it need not find that he "directed" the Saccoccia enterprise since "an enterprise is operated not just by upper management but also by lower rung participants who act on the direction of upper management." *See Reves v. Ernst & Young,* —— U.S. ——, ——, ——, 113 S.Ct. 1163, 1170, 1172, 122 L.Ed.2d 525 (1993) (independent accounting firm must be shown to have "participated" in, or played "some part in directing," the enterprise). Although Gabriele preserved the present claim with a timely Rule 30 objection, it is foreclosed by recent circuit precedent. *See Hurley,* 63 F.3d at 9 (finding no plain error, noting that *Reves* has no relevance to defendants who were "employees," as distinguished from independent

or outside participants like the accounting firm in *Reves* ) (citing *United States v. Oreto,* 37 F.3d 739, 750 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995)).

■ The government introduced ample evidence—unchallenged on appeal—that Gabriele, unlike the accounting firm in *Reves,* was not an independent "outsider" but a full-fledged "employee" of the Saccoccia enterprise, as evidenced by Saccoccia's anticipated "purchase" of RTI from Gabriele and his instructions to underlings to leave cash for Gabriele. Even employees not engaged in *directing* the operations of the RICO enterprise are criminally liable if they are "plainly integral to carrying [it] out." *See id.* The district court gave precisely this instruction. *See Reves,* —— U.S. at ——, 113 S.Ct. at 1173.[11]

### 2. *Other RICO–Related Instructions*

■ Gabriele contends that the district court declined to give five other jury instructions which were essential to enable the jury to differentiate section 1957 from RICO conspiracy—"two offenses occupying opposite ends of the white collar [crime] spectrum." Brief for Appellant at 46. Although this challenge was duly preserved as well, we will reverse only if the requested jury instructions represented substantially correct statements of the applicable law not substantially covered in the instructions given, and their omission seriously undermined Gabriele's ability to mount a defense. *See Brandon,* 17 F.3d at 448; *see also Noone,* 913 F.2d at 30. We discern no error.

Request No. 6 would have precluded conviction unless the jury found that *RTI* was part of the RICO enterprise, on the theory that Gabriele could not have "participated" unless he "directed" a component part of the enterprise. Thus, it was predicated on an incorrect view of the law. *See supra* Section II.B.1. Whether or not RTI was part of the RICO enterprise, there was ample evidence

---

**11.** To the extent Gabriele is intimating that *Reves* did not determine whether an employee's contribution to the enterprise may be so insignificant as not to constitute "participation," *id.* at —— n. 9, 113 S.Ct. at 1173 n. 9, we need note only that Gabriele's participation was by no means insignificant.

from which the jury could find that Gabriele "participated" as a Saccoccia employee who was "plainly integral to carrying out" the enterprise even though he did not "direct" its operations. *Id.*

Request No. 9 proposed to instruct the jury that Gabriele's commission of two predicate acts, *without more*, would not establish his agreement to "participate" in the RICO enterprise. Request No. 12 would have precluded conviction unless the jury found that Gabriele "knew of the conspiracy's essential features, general scope, and overall goals." These requests were substantially covered by the final charge, which repeatedly reminded the jury that acquittal was required unless it found that Gabriele "under[stood] the unlawful nature of the plan" and entered into a "mutual agreement" to accomplish "some unlawful purpose."

■■■ Request No. 16 stated that "a person who may have furnished goods, money, or services to another person who he knows is or will be engaged in criminal activity and that these goods or services may be used in that activity does not by furnishing such goods, money or services necessarily become a member of the conspiracy." *See Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). The truism underlying the requested instruction is that the seller's mere knowledge of the existence of a conspiracy is not in itself sufficient to convict him as a conspirator; the seller must also have intended that the sale promote the unlawful goals of the conspiracy. *See, e.g., United States v. Garcia–Rosa*, 876 F.2d 209, 216 (1st Cir.1989), *cert. denied*, 493 U.S. 1030, 110 S.Ct. 742, 107 L.Ed.2d 760, *cert. granted and vacated on other grounds*, 498 U.S. 954, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990). Nonetheless, as we have noted, the *Direct Sales Co.* instruction normally is not essential if the trial court advises the jury that the defendant cannot be convicted absent a finding that he joined the conspiracy with intent to further its unlawful purposes. *Brandon*, 17 F.3d at 448–49. The jury charge repeatedly brought home the latter point.

Request No. 20 stated a "theory of the defense," in Gabriele's words; namely "that the Government has failed to prove ... that the defendant agreed to participate in the [conspiracy] ... or that he had knowledge that his transaction may have involved criminally derived property." As a theory of the defense, the request overreached by attempting to co-opt the court. To the extent the request purposed a "reasonable doubt" standard, it was surplusage, since the charge delineated the requisite elements under section 1962(c) and (d), and repeatedly instructed the jury that the government had the burden of proving each element beyond a reasonable doubt. *See United States v. Long*, 977 F.2d 1264, 1272 (8th Cir.1992) (where lack of knowledge is defense, jury instructions on conspiracy, intent, and specific intent adequately covered "theory of the defense").[12] There was no instructional error relating to the RICO conspiracy.

## C. *The Motion for Mistrial and the Privilege Against Self–Incrimination*

Finally, Gabriele argues that the district court violated his Fifth Amendment privilege against self-incrimination by stating to the jury, following the close of the government's case: "You may return to the jury room for your afternoon recess and we will hear *the rest of the story.*" (Emphasis added.) *See Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *United States v. Lavoie*, 721 F.2d 407, 410 (1st Cir.1983), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1424, 79 L.Ed.2d 749 (1984). Gabriele insists that the jury necessarily drew the improper inference that he would take the stand to "tell his story," whereas in fact he rightfully elected not to testify. He adds that the district court instruction given in lieu of his request for a mistrial was inadequate, because the court merely noted that a defendant bears no burden of proof in a criminal case, while failing to emphasize that no adverse inference may be drawn from a defendant's decision to exercise his constitutional right not to testify at trial.

■■■■ Whether a statement in the presence of the jury infringed upon the privilege

---

12. Since there was no instructional error, Gabriele's "cumulative error" claim goes nowhere.

against self-incrimination is a question normally reviewed *de novo. See United States v. Glantz*, 810 F.2d 316, 320 n. 2 (1st Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). On the other hand, the denial of a motion for mistrial is reviewed for abuse of discretion. *See United States v. Rullan–Rivera*, 60 F.3d 16, 18 (1st Cir.1995). As Gabriele interposed no timely objection,[13] however, we review only for plain error. *See* Fed.R.Crim.P. 52(b). In all events, we find neither plain error nor abuse of discretion in the denial of the motion for mistrial.

First, the colloquial expression utilized by the trial judge ("we will hear the rest of the story") plainly was intended merely to inform the jury that though the government's case had been completed, the *defense*—as distinguished from the defendant's testimony—had yet to be heard. Although appellate review is plenary, *Glantz*, 810 F.2d at 320 n. 2, we think it would be imprudent to attribute the more ominous import now urged by Gabriele on appeal, in light of the view apparently taken by the trial court and counsel at the time. *See United States v. Robinson*, 485 U.S. 25, 30–31, 108 S.Ct. 864, 867–68, 99 L.Ed.2d 23 (1988) (noting, in context of challenge to ambiguous statements of prosecutor—arguably constituting improper comment on defendant's exercise of privilege against self-incrimination—"we do not think that an appellate court may substitute its reading . . . for that of the trial court and counsel"). Thus, we think it would amount to impermissible conjecture to conclude that the jury understood the trial judge's reference to the "rest of the story" as " 'a comment on the failure of the accused to testify.' " *See Glantz*, 810 F.2d at 322 (noting that the challenged comment must be "manifestly intended or . . . of such character that the jury would *naturally* and *necessarily*

take it to be a comment on the failure of the accused to testify") (emphasis added) (citation omitted). It would be particularly problematic to do so here, since the defense clearly signaled that it perceived the statement to be objectionable at the time only because the jury might take it as a license to shift the burden of proof. We believe, therefore, that an appellate court would be overreaching were it to attribute to the jury the more ominous interpretation now proposed by the defense. *See Robinson*, 485 U.S. at 30, 108 S.Ct. at 867.

Second, even assuming the jury so interpreted the judge's statement, the preliminary instructions emphatically charged that "a defendant has a right to remain silent . . . [and] you should understand that if he does not [take the witness stand], you should not draw any inferences from that." The final charge once again stated that "the fact that a defendant has, in this case, . . . chosen to exercise [the privilege against self-incrimination] should not be considered in any way by you as proving anything one way or the other." Thus, we see no sound basis for departing from the customary presumption that juries follow their instructions. *See Rullan–Rivera*, 60 F.3d at 18. Accordingly, the district court did not abuse its discretion in denying the motion for mistrial.

*The district court judgment is affirmed.*

---

**13.** The government argues that the challenged comment must be viewed as innocuous because even the defense failed to *perceive* the statement as an infringement upon Gabriele's privilege against self-incrimination, as evidenced by the fact that the defense objected solely on the ground that the jury might construe the statement as shifting the burden of proof to the defense. Gabriele responds that he delayed his Fifth Amendment objection until the defense rested, because he had not yet decided whether to take the stand.

We think the delay in interposing an objection on the Fifth Amendment ground effected a waiver. Whether or not Gabriele ever took the stand, the district court's statement (as construed by Gabriele) could have had a coercive effect upon his decision whether to testify. Thus, had the alleged Fifth Amendment infringement been perceived, it seems clear that it would have been more advantageous to raise it *before* that decision had to be made.