USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1222 UNITED STATES OF AMERICA, Appellee, v. WILLIAM J. CAMUTI, Defendant, Appellant. ___________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge]  ___________________ ____________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge.  _____________ ____________________ Thomas V. Laprade, by Appointment of the Court, with whom Black, _________________ _____ Lambert, Coffin & Rudman was on briefs for appellant. ________________________ William P. Stimson, Assistant United States Attorney, with whom ___________________ Donald K. Stern, United States Attorney, was on brief for the United _______________ States. ____________________ March 12, 1996 ____________________ BOUDIN, Circuit Judge. In a jury trial beginning in ______________ September 1993, William Camuti was tried on 13 counts of mail fraud in connection with a scheme to defraud investors by obtaining their funds through false representations. 18 U.S.C. 1341, 2. On October 18, 1993, the jury acquitted Camuti on two counts and convicted him on the remaining 11 counts. Camuti was sentenced on February 28, 1994 to 116 months' imprisonment and ordered to pay $2,528,000 in restitution. He now appeals, challenging both his conviction and his penalties. Taken in the light most favorable to the government, United States v. Brien, 59 F.3d 274, 275 (1st _____________ _____ Cir.), cert. denied, 116 S. Ct. 401 (1995), the evidence _____ ______ submitted at trial permitted the jury to find the following. Starting in the early 1980s Camuti ran a mortgage brokerage business called "The Loan Depot" from a building in Randolph, Massachusetts. Camuti attracted a large number of homeowners seeking second mortgages and placed their applications with various lenders. Beginning in December 1988 and continuing for some period, Camuti began to solicit investments from several Waltham businessmen, known at trial as "the Waltham Five." He represented to them that their funds would be invested in high-quality residential mortgages that he would select and service. The Waltham Five invested more than $2.5 million -2- -2- with Camuti, but in fact Camuti never invested their money in residential mortgages.  In February 1989, Camuti hired Joseph Carroll, a young stockbroker, to market pools of mortgages to potential investors. Carroll and several part-time salesmen telephoned potential investors to persuade them to invest money in mortgage pools. The first such pool was to be backed by a mortgage on the Loan Depot office building in Randolph, but Carroll testified at trial that this initial effort fell short and that he managed to raise only $125,000 compared with a goal of $900,000.  Carroll further testified that Camuti responded to this setback by instructing Carroll to tell investors that each mortgage pool consisted of a group of residential mortgages on homes in well-to-do Boston suburbs. Camuti was represented to be a co-manager of the pools, and he signed a mortgage pool "participation certificate" that was sent to each investor. Over the next year, the program attracted over $1.7 million. In fact no residential mortgages secured these investments. In October 1989, about nine months after Carroll began his efforts, the Securities Division of the Massachusetts Secretary of State's office began to receive reports that Camuti might be illegally marketing unregistered securities and sent him a letter of inquiry. Camuti told his attorney -3- -3- to respond that the Loan Depot's solicitations had produced no response; by letter of October 27, 1989, his lawyer told the Securities Division, inaccurately, that no funds had been collected and no mortgage pool participations had been issued. In a subsequent letter, the lawyer told the Securities Division, again inaccurately, that all such solicitations had ceased. In spring 1990, Camuti began falling behind in interest payments and, in May 1990, a Boston newspaper reported allegations that there were no residential mortgages backing Camuti's pools. In December 1990, members of the Waltham Five met with Camuti and he admitted that their funds were not secured by residential mortgages. In later negotiations, the Waltham Five sought other collateral; one proposal was to have one of their members take control of the assets in the Loan Depot as a trustee for the other investors, but no settlement was ever reached. At trial the government presented the evidence just described through approximately twenty-five witnesses. These included Carroll, various investors who had been solicited by Carroll, other persons familiar with Camuti's role in the Loan Depot, and four members of the Waltham Five. Three of the four testified that Carroll himself had told them that their investments would be backed by residential mortgages; the fourth was not specific on this point.  -4- -4- Camuti's own position at trial was that Carroll had deceived Camuti and that Camuti had discovered Carroll's misrepresentations only in the spring of 1990, and then discharged Carroll. As to the Waltham Five, Camuti suggested that they, or at least some of them, were engaged in an effort to secure control of the Loan Depot which, in its mortgage broker activities, had been a successful business. Camuti also denied representing to the Waltham Five that their investments would be used to purchase residential mortgages. On this appeal, Camuti does not claim that the evidence was insufficient to hold him liable for mail fraud. Rather, he argues on several fronts that the trial court effectively deprived him of a fair trial by restricting his opportunity to present his defense and, further, that the court misinstructed the jury. He also contests his sentence and restitution order. The Cross-Examination of the Waltham ____________________________________ Five. The government had little trouble in this case proving ____ that Carroll had defrauded the mortgage pool investors; its problem was to implicate Camuti in these actions. The main witness for the government, unfortunately, was Carroll who directly implicated Camuti but, as a self-confessed defrauder, was hardly a perfect witness. The government did have other evidence linking Camuti to Carroll's frauds, but it was obviously quite helpful to the government to show that -5- -5- Camuti himself had been making comparable misrepresentations to his own friends, namely, the members of the Waltham Five. In response, Camuti asserted that the Waltham Five were using their transactions with Camuti to take over Camuti's business. To make this showing, Camuti sought to cross- examine a Waltham Five member about the proposed trust document that the Waltham Five had tendered to Camuti, and posed questions designed to show that another member had acquired an interest in certain of the Loan Depot's assets. The district judge sustained a number of objections by the government to these inquiries. Camuti now claims that these rulings were error.  Few of the tasks of a trial judge are more difficult than coping with this kind of problem. A fragment of evidence is offered seemingly remote from the main issues. At this point, the trial judge has to rule on relevance, at least provisionally, without knowing how this fragment will look as part of a larger pattern. And (assuming a proper objection), the judge may also have to consider other limitations, such as those based on prejudice or confusion, in deciding how far to let issues of marginal relevance be pursued. In this instance, the district court sought side bar explanations for the disputed evidence and made clear its willingness to give the defense wide latitude to explore the -6- -6- alleged scheme of the Waltham Five if it could be shown to __ bear on the question whether Camuti had acquired money from the Waltham Five based on false representations. But as we read the colloquies, ultimately the district court concluded that the necessary foundation was lacking and that questions about the trust document or the present ownership of Loan Depot assets were at best minimally relevant, confusing and a waste of time. We think that this judgment was clearly within the broad discretion allowed to district courts in these matters, United States v. Jarabek, 726 F.2d 889, 902-03 (1st Cir. ______________ _______ 1984), and Camuti's claim of error fails without regard to the government's procedural objections (several of which have some bite). The crime with which Camuti was charged--mail fraud--did not require that the victims be pure of heart or even that they have been effectively deceived by the charged misrepresentations. Materiality issues aside, all that matters is that the representations were deliberately made by the defendant. United States v. Allard, 926 F.2d 1237, 1242 _____________ ______ (1st Cir. 1991). Camuti's position, as we understand it, is that the alleged motives and later actions of the Waltham Five bore on the question of whether Camuti had ever made the misrepresentations to them at all; Camuti argues that the Waltham Five loaned money to Camuti rather than invested it ______ -7- -7- in supposed residential mortgages; and--or so Camuti further reasons--the malign motive and later actions that the defense has attributed to the Waltham Five are inconsistent with their story that Camuti made misrepresentations.  But the inferences are so thin that they can barely, if at all, meet the generous test of relevance under Fed. R. Evid. 401. That the Waltham Five sought security after they discovered Camuti's fraud hardly suggests that any of them were previously plotting to take over the Loan Depot business; and even a prior plot to obtain such control would tell little about whether Camuti had made false statements when he obtained their funds. The difference between proof and speculation is a matter of degree, but the proof here is close to the latter end of the spectrum.  At the same time, quite apart from irrelevance, the evidence sought to be adduced did have the capacity to mislead and confuse the jury. See Fed. R. Evid. 403. ___ Although irrelevant to any proper defense, it lent itself to the suggestion that whatever Camuti may have done, the Waltham Five took advantage of him when he found himself hard-pressed and that one member had enriched himself at Camuti's expense. In other words, the scenario that Camuti sought to suggest could easily have been useful to Camuti but not for any legitimate purpose. -8- -8- Camuti cites to us precedent that the right of cross- examination is secured by the Confrontation Clause of the Constitution, but those cases involve unjustifiable restrictions on cross-examination. E.g., Chambers v. ____ ________ Mississippi, 410 U.S. 284 (1973). The ordinary application ___________ of Fed. R. Evid. 401-03 does not even remotely impair any constitutional right under the Sixth Amendment. See Delaware ___ ________ v. Van Arsdall, 475 U.S. 673, 679 (1986); United States v. ____________ ______________ Kepreos, 759 F.2d 961, 964 (1st Cir. 1985). It is worth _______ adding that the district court went out of its way to offer Camuti an opportunity to create a foundation for the evidence he sought to adduce. The Telephone Tape. As part of the defense's case, ___________________ Camuti sought to play for the jury an audio tape recording. The tape had been found in Carroll's desk and, taken at face value, included several telephone sales pitches by Carroll to prospective investors. In the course of one of the pitches, apparently relating to commercial property mortgages, the speaker--purporting to be Carroll--said that, with respect to an investment vehicle, "I have one of my clients that's gonna take the whole deal, and that's a half a million dollars, himself." Camuti's position, at trial and on appeal, is that this comment showed that Carroll's sales efforts to raise money on commercial mortgages were a success. This fact, Camuti -9- -9- reasons, undermined Carroll's own testimony that his commercial-mortgage sales efforts had largely failed and that this failure caused Camuti to instruct Carroll to begin pitching non-existent residential mortgages instead. Camuti's brief assumes that, if the tape were played, Carroll's comment about his half-a-million-dollar client would have been admissible for its truth. The tape recording, like most other "real" evidence, could be admitted only upon an offer or promise of evidence sufficient to permit the jury to find that the tape was what its proponent (Camuti) claimed it to be: here, recordings of actual telephone sales calls by Carroll. See Fed. R. Evid. ___ 901. Camuti offered to testify that he himself recognized the voice as that of Carroll. The government said that this was insufficient, pointing out that no chain of custody had been proved and that Camuti himself had recorded over portions of the tape by using it to record calls to or from his own telephone. The district judge listened to the tape and chose to exclude it. His first comment was that the tape had not been adequately authenticated. He continued by saying that, in light of Camuti's constitutional right to confront witnesses against him, see Chambers, 410 U.S. at 294, the court would ___ ________ admit the tape if "truly exculpatory." But the judge ruled that the call in question appeared to deal with "interests in -10- -10- commercial property" and was therefore "not central to this case . . . ." Chain of custody is one means of authenticating evidence but not the only means; and voice identification by Camuti would have served as evidence that Carroll was the speaker. The government's better argument is that there is some internal evidence that raises doubts about the tape's authenticity, which Carroll could have removed if Camuti had called him to authenticate the tape. The district judge has considerable discretion in resolving authentication issues under Rule 901, United States v. Carbone, 798 F.2d 21, 24 ______________ _______ (1st Cir. 1986), but the district court did not choose to exclude the tape on this ground--saying, instead, that the evidence was not exculpatory. We conclude that if the tape had any relevance at all, it was so slight that the exclusion of the tape was at the most harmless error. Under ordinary hearsay rules the tape was never admissible as evidence that Carroll had in fact sold a commercial mortgage to one of his clients for $500,000. The taped conversation, even if authentic, was an out-of-court statement by Carroll; and Camuti makes no effort to show that the statement falls within any hearsay exception. Accordingly, if offered for the truth of the matter asserted--as Camuti assumes it to be--the taped comment is excluded by Fed. R. Evid. 802. -11- -11- In Chambers, the Supreme Court held that it can violate ________ due process to exclude reliable hearsay evidence crucial to the defense; there, the state court in a murder trial had excluded out-of-court statements of another that he had committed the crime with which the defendant was charged. 410 U.S. at 292-93. But the Chambers statements were ________ arguably reliable, cf. Fed. R. Evid 804(b)(3), and vitally ___ important to the defense; the hearsay comment of Carroll is neither. Chambers is not a general abrogation of the hearsay ________ rule. Lee v. McCaughtry, 933 F.2d 536, 538 (7th Cir.), cert. ___ __________ _____ denied, 502 U.S. 895 (1991). ______ Of course, Carroll's statement might still have been admissible not for its truth but for impeachment, if sufficiently inconsistent with his trial testimony. Ordinarily, extrinsic evidence is not admissible to impeach by contradiction; but an exception exists where the contradiction is on a material issue. United States v. _____________ Perez-Perez, 72 F.3d 224, 227 (1st Cir. 1995). It is not ___________ easy to tell whether the vague reference on the tape to a prospective $500,000 investment is at odds with any point in Carroll's trial testimony. But even if we assume that the tape was authentic and extrinsic evidence of Carroll's statement admissible to impeach, it could not have altered the outcome of this case. At most the contradiction, if contradiction there was, would -12- -12- have cast a small measure of additional doubt upon Carroll's veracity. But Carroll was already a proven liar, having engaged for months in selling investors phony mortgage certificates. The jury nevertheless believed him when he said that Camuti was responsible for the scheme. The jury had a basis for believing Carroll's trial testimony because there was also a fair amount of other evidence supporting the view that Camuti had collaborated in the fraud: for example, evidence that Camuti was familiar with Carroll's operation, had signed the investment certificates, had told similar lies about residential property to the Waltham Five, and had instructed his own lawyer to mislead the state authorities when they began to investigate. The idea that one additional lie from Carroll would have undermined this structure is fanciful. United ______ States v. Legarda, 17 F.3d 496, 499 (1st Cir.), cert. denied, ______ _______ _____ ______ 115 S. Ct. 81 (1994). Jury Instructions. Camuti says that the district court __________________ erred in two rulings on jury instructions: one was the court's refusal to give Camuti's requested instruction that good faith was a defense to the fraud charge; the other was granting the government's request to instruct that a defendant's knowledge of fraud may be inferred from willful blindness. Camuti's counsel did not object after the jury -13- -13- was instructed and before it retired, as required by Fed. R. Crim. P. 30, so our review is limited to plain error. On the good faith instruction, there was no error at all, let alone plain error. A separate instruction on good faith is not required in this circuit where the court adequately instructs on intent to defraud. United States v. _____________ Dockray, 943 F.2d 152, 155 (1st Cir. 1991). Here, the _______ court's instruction on fraud is not seriously challenged. Camuti says that the instruction was needed here because the court limited Camuti's evidence offered to show good faith. But missing evidence is not supplied by instructions; and if evidence of good faith was excluded in error, Camuti was free to raise the point. As for the willful blindness instruction, it was amply justified in this case. United States v. Gabriele, 63 F.3d _____________ ________ 61, 66-67 (1st Cir. 1995). A jury could reasonably find that even if Camuti had not actually directed the fraud, the warning signs were ample to have alerted Camuti to the fraud unless he deliberately chose to close his eyes to them; two good examples are the newspaper reports of the fraud (articles Camuti discussed with his investors) and the contacts by the state investigators (which Camuti sought to thwart with false information).  Camuti suggests that this blindness instruction was ____ faulty because it could have led the jury to apply a -14- -14- negligence standard in determining his guilt. On the contrary, the judge not only properly instructed the jury as to the elements of fraud and used the usual formula for willful blindness, see E. Devitt, et al., Federal Jury ___ _______ _____________ Practice and Instructions 17.09 (4th ed. 1992); Gabriele, _________________________ ________ 63 F.3d at 66 n.6, but the judge also told the jury that it could not find that Camuti acted knowingly if he "was simply careless."  Sentence Calculations. In calculating the offense level _____________________ for Camuti's offense, the district judge increased the figure by two levels for obstruction of justice under U.S.S.G.  3C1.1. From the prosecutor's request and the subsequent colloquy, it is evident that the district court based this ruling on a finding that Camuti had committed perjury during the trial. United States v. Dunnigan, 113 S. Ct. 1111 ______________ ________ (1993), ordains an enhancement in those circumstances. On appeal, Camuti argued that the district judge's bare statement at sentencing--that an obstruction of justice had occurred--was too bare to show that the district judge had found each of the elements of the perjury enhancement as required under Dunnigan: falsity, willfulness and ________ materiality. See 113 S.Ct. at 1116-17. The government said ___ that the findings could be inferred from context or that the error, if any, was harmless. Instead of speculating, we retained jurisdiction and, by order, asked the district court -15- -15- to identify the obstructive conduct and the basis for any Dunnigan findings. ________ By a supplemental order entered on November 9, 1995, the district court supplied the specifics. Its order found that the perjury lay in Camuti's testimony that he was unaware of the misrepresentations made by Carroll to investors. The district court's order also specifically found this testimony to be false, willful and material. The findings are not clearly erroneous and, in fact, Camuti has offered us no reason to doubt that they were correct. Accordingly, nothing more need be said about the perjury enhancement. The district court imposed a further four-level upward adjustment based on a finding that Camuti was the organizer of a criminal organization that was "extensive." U.S.S.G.  3B1.1(a). This adjustment was imposed after a recitation by the government of evidence showing that Camuti's Loan Depot organization had employed the services of over a dozen people, that the fraud was sophisticated and directed at many investors, and that it was orchestrated by Camuti. The district judge said that he was persuaded by this argument. On appeal, Camuti argues (apparently for the first time) that the enhancement required not only that the fraud be extensive but also that Camuti have played an extensive role as an organizer or leader. The guidelines do so require, U.S.S.G. 3B1.1(a); United States v. Tejada- ______________ _______ -16- -16- Beltran, 50 F.3d 105, 111 (1st Cir. 1995); but in adopting _______ the prosecutor's scenario, the district judge so found and the evidence supports him. Thus, if not forfeited, the argument fails. Camuti also contends that the same enhancement amounts to double counting because the size of the fraud was already reflected in an adjustment based on the loss inflicted by the fraud. U.S.S.G. 2F1.1(b)(1). One could argue about whether double counting is involved: the organizer adjustment focuses not on the amount of loss but on the role of the defendant and the size of the organization; still, the latter element often correlates with the size of the loss. But the short answer is that this is at worst permissible ___________ double counting, United States v. Lilly, 13 F.3d 15, 19 (1st _____________ _____ Cir. 1994). A final two-level upward adjustment was based upon Camuti's abuse of a position of "private trust" to "significantly facilitate[]" the offense. U.S.S.G. 3B1.3. The government's theory was that, at least as to the Waltham Five, Camuti was effectively a fiduciary trusted by them to invest their money in residential mortgages that he (Camuti) would select. Cf. United States v. Newman, 49 F.3d 1, 9 (1st ___ _____________ ______ Cir. 1995). The district court accepted the theory despite Camuti's rather general objections that his relationship with the investors had not facilitated any fraud. -17- -17- On appeal, Camuti has revised his objection. He now says that his activities vis-a-vis the Waltham Five were "incidental" to the offenses on which he was sentenced, and he points out that all but one of the mail fraud counts related to other investors solicited by Carroll. This _____ argument rests on the peculiar logic of the mail fraud statute which makes criminal not the scheme to defraud standing alone but each use of the mails in connection with a ___ scheme to defraud. 18 U.S.C. 1341. The short answer is that for purposes of determining responsibility at sentencing, the guidelines include not only the offense of conviction but also any other conduct that is "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. 1B1.3(a)(2). The government's main excuse for offering evidence as to the Waltham Five was that the frauds directed against the Waltham Five were part of the same overall scheme. On this theory, those frauds were also "relevant conduct" at sentencing, regardless of specific mailings. There was certainly evidence that the Waltham Five were defrauded. Whether there was only a single overarching scheme might be debated, cf. U.S.S.G. 1B1.3, comment. ___ (n.9); United States v. Sklar, 920 F.2d 107, 111 (1st Cir. ______________ _____ 1990); and there is no explicit finding on the point by the district court. But neither did Camuti make his present -18- -18- argument at sentencing. It is enough here that the evidence permitted the finding of a single scheme and there was certainly no plain error where, without objection, the district court proceeded on that premise.  Restitution. At sentencing, the district judge ordered ___________ Camuti to make restitution payments to members of the Waltham Five in the amount of $2,528,000. This award was based on computations in the pre-sentence report reflecting investment losses in this range claimed by the individual members of the Waltham Five. Camuti did not object to the pre-sentence report nor object to the restitution order when the district court specified the amounts. On appeal, Camuti claims for the first time that the restitution order--aside from $37,500 owing to Bowse--was plain error. Camuti's theory is straightforward. Under the statutory language that applies to his case, restitution may be ordered only for losses caused by the "offense" or "offenses" of conviction. 18 U.S.C. 3663(a) (1988); see Hughey v. United ___ ______ ______ States, 495 U.S. 411 (1990). Later amendments have broadened ______ the authority to require restitution to include harm due to "the defendant's criminal conduct in the course of the scheme," 18 U.S.C. 3663(a)(2) (Supp. V, 1993), but the changes are not retroactive. Newman, 49 F.3d at 11 & n.14. ______ Camuti's argument is that none of the investments of the Waltham Five, apart from $37,500 owing to Bowse, was related -19- -19- to an individual mailing specified as a count in the Camuti indictment. As already noted, the mail fraud offense is committed by a mailing in aid of a scheme to defraud. One can therefore _______ argue that a loss is caused by the "offense" only if it stems from a transaction linked to a specific mailing for which the defendant was indicted. Although several circuits have taken a broader view, this circuit has twice construed the old restitution statute to incorporate such a gloss, Newman, 49 ______ F.3d at 11; United States v. Cronin, 990 F.2d 663, 666 (1st _____________ ______ Cir. 1993), and this precedent is binding on this panel. The government's first answer is that Camuti did not raise the Hughey issue in the district court and therefore ______ waived it. Its other answer is to point to counts 11 and 12 of the indictment, charging Camuti with the mailings by his lawyer to the state authorities. These mailings, says the government, delayed the discovery and termination of the scheme and thereby can be deemed to have caused the losses from investments made after the date of the first letter. According to the government, almost all of the Waltham Five investments occurred after this date. Camuti, in turn, calls this causal connection a threadbare speculation. The government's waiver argument does not meet riposte of plain error, see United States v. Olano, 113 S. Ct. 1770 ___ _____________ _____ (1983); and our precedents limiting the reach of the old -20- -20- restitution statute are plain enough. It could be argued that Olano's further requirement--that the plain error be "a _____ miscarriage of justice" or the like, id. at 1779--is not ___ satisfied where, as here, the losses in question were due to Camuti's fraudulent scheme, even if not directly linked to the charged mailings. But such a rough and ready approach would arguably be at odds with our recent decision in United ______ States v. Gilberg, No. 95-1586, slip op. at 15-17 (Jan. 31, ______ _______ 1996). But in this case, unlike Gilberg, the government does _______ have an argument that the restitution ordered by the district court can be sustained on the merits based on counts 11 and 12. The government's causation argument, and Camuti's response, are largely fact-bound; to resolve the dispute would require a remand to the district court to develop further facts and a decision by the district court that might show that the restitution judgment should be smaller. Since Camuti failed to raise this issue in a timely fashion and it is by no means certain that the restitution judgment is substantially excessive, we exercise our undoubted discretion under Olano to disregard the alleged error. 113 S. Ct. at _____ 1778.  Affirmed. ________ -21- -21-