# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 97-3021

_____

United States of America,                    *
                                              *
    Plaintiff - Appellee,                 *
                                              *
v.                                            *
                                              *
Scott E. Hildebrand,                          *
                                              *
    Defendant - Appellant.                *


_____                          Appeals from the United States
                                     District Court for the
No. 97-3023                          Northern District of Iowa.
No. 97-3278
_____

United States of America,                    *
                                              *
    Plaintiff - Appellee/Cross-           *
    Appellant,                            *
                                              *
v.                                            *
                                              *
Joan M. Webb,                                 *
                                              *
    Defendant - Appellant/Cross-          *
    Appellee.                             *

_____

No. 97-3024
No. 97-3277

_____

United States of America,                    *
                                              *
    Plaintiff - Appellee/Cross-           *
    Appellant,                             *
                                              *
    v.                                     *
                                              *
Larry A. Webb,                                *
                                              *
    Defendant - Appellant/Cross-           *
    Appellee.                              *

_____

No. 97-3026
No. 97-3280

_____

United States of America,                    *
                                              *
    Plaintiff - Appellee/Cross-           *
    Appellant,                             *
                                              *
    v.                                     *
                                              *
David I. Gardemann,                           *
                                              *
    Defendant - Appellant, Cross-          *
    Appellee.                              *

_____

No. 97-3031
No. 97-3279

_____

United States of America,       *
                                 *

     Plaintiff - Appellee/Cross-    *
     Appellant,                 *
                                 *

     v.                           *
                                 *

Joseph A. Mentlick, Jr.,      *
                               *

     Defendant - Appellant/Cross-  *
     Appellee.                 *


_____

No. 97-3033
No. 97-3281

_____

United States of America,       *
                                 *

     Plaintiff - Appellee/Cross-    *
     Appellant,                 *
                                 *

     v.                           *
                               *

Kenneth Lee Kraklio,       *
                               *

     Defendant - Appellant/Cross-  *
     Appellee.                 *

_____

No. 97-3276

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * |
| v. | * |
| | * |
| Allen K. Zurcher, | * |
| | * |
| Defendant - Appellee. | * |

_____

Submitted: February 12, 1998
Filed: July 28, 1998

_____

Before McMILLIAN and LOKEN, Circuit Judges, and BOGUE,[*] District Judge.

_____

LOKEN, Circuit Judge.

Scott Hildebrand, Joan Webb, Larry Webb, David Gardemann, Joseph Mentlick, Kenneth Kraklio, and Allen Zurcher were convicted of mail fraud, conspiracy to commit mail fraud, and conspiracy to launder money for their roles in an organization known as "We The People" that offered to file claims in a purported federal class action lawsuit for a fee of $300. Gardemann, Kraklio, and the Webbs appeal their convictions; Mentlick appeals his conviction and sentence; and Hildebrand appeals his

---

[*]The HONORABLE ANDREW W. BOGUE, United States District Judge for the District of South Dakota, sitting by designation.

sentence. The government appeals the sentences imposed on the Webbs, Gardemann, Mentlick, Kraklio, and Zurcher. We affirm.

## I. Background and Sufficiency of the Evidence Issues.

Defendants' scheme grew out of a lawsuit filed in the United States District Court for the District of Colorado in which two families filed a pro se class action complaint alleging unlawful foreclosure of their farms in state court. We will refer to this lawsuit as the Baskerville case. Plaintiffs moved for appointment of Hildebrand as receiver for various Farm Credit Services affiliates, the Farmers Home Administration, and the National Banking Association. In early June 1993, Hildebrand filed a document declaring himself receiver and videotaped himself on the steps of the federal courthouse reading a press release announcing that the Federal Land Bank and its affiliates, the Farmers Home Administration, the National Banking Association, and the City of Fort Collins and County of Larimer, Colorado, had been placed in receivership by the Baskerville court. Hildebrand then organized "We The People." Through printed literature, videotaped presentations, and public meetings held in at least forty States, We The People represented that anyone who had ever borrowed money from a Federal Reserve Bank System entity, paid taxes or attorney's fees, been divorced, or had a death in the family was entitled to a substantial damage award in the Baskerville case. The catch was that claimants needed to pay We The People $300 to cover the administrative costs of filing claims. The group permitted impoverished claimants to file without paying the $300 fee on the condition that it receive twenty percent of any damage recovery. These were called "80/20" claims. We The People warned that claims would be paid on a first-come, first-serve basis; that no new claims could be filed once pay-outs began; and that citizens who did not file a claim would face criminal prosecution.

Defendants had varying roles in We The People. Hildebrand was the leader and promoter. His home in Greene, Iowa was the organization's headquarters. Mentlick

was Hildebrand's right-hand man who proclaimed himself a receiver and appeared regularly with Hildebrand on promotional videos and at promotional meetings. Gardemann entered claims information into computers, was actively involved in promotional meetings, and had signature authority on three bank accounts used to deposit claims money. Kraklio and the Webbs were claims writers who solicited claims and collected administrative fees. Kraklio submitted at least six hundred claims to Hildebrand. The Webbs supervised forty claims writers operating in seven States. Claims writers were generally paid $50 per paid claim. Zurcher was the group's bookkeeper, a job he described as "overseeing the claims administration activity."

The government identified 6,832 claims filed with We The People claims writers between Spring 1993 and October 1994. About two-thirds were fully paid claims, evidence that the group collected at least $1.3 million in administrative fees. No claims were submitted to the Baskerville court, which denied class certification and the motion to appoint receivers in June 1993 and dismissed the case with prejudice in November 1993. See Baskerville v. Federal Land Bank, 25 F.3d 1055 (10th Cir. 1994).

Defendants were indicted in September 1995. At trial, the central issue was whether each defendant participated in the scheme with intent to defraud. Without disputing their roles in the scheme, defendants argued they did not know the truth about the Baskerville case, did not profit from their activities, and participated because of strongly held political views. They emphasized the 80/20 claims, the organization's meticulous records, and the steps taken to ensure that claims forms were properly filled out. Two defendants were acquitted at the close of the government's case. A mistrial was declared as to Scott Hildebrand when his attorney became ill; he was tried separately and found guilty of all charges in June 1997. The remaining defendants were found guilty of all charges at the end of the first trial in December 1996.

On appeal, Mentlick, Kraklio, and the Webbs argue the evidence was insufficient to support their convictions. We view the evidence in the light most favorable to the

verdict, giving the government the benefit of all reasonable inferences and reversing only if no reasonable jury could have found every element of the offense beyond a reasonable doubt. See United States v. Berndt, 86 F.3d 803, 809 (8th Cir. 1996).

A. Mail Fraud. These defendants argue the evidence does not support an inference of criminal intent to commit, or to conspire to commit mail fraud. We disagree. To sustain a conviction for mail fraud under 18 U.S.C. § 1341, the evidence must establish that a defendant knowingly participated in a plan or scheme to defraud in which it was reasonably foreseeable the mails would be used. To prove a conspiracy to commit mail fraud under 18 U.S.C. § 371, the evidence must establish that a defendant intentionally joined a conspiracy to commit mail fraud, knowing the purpose of the conspiracy. See United States v. Earles, 955 F.2d 1175, 1177-78 (8th Cir. 1992). The victims paid $300 to an organization that had no intent to file claims on their behalf. Thus, overall the scheme was manifestly fraudulent. As to these defendants, there was substantial evidence that they had access to newspaper articles, Baskerville court documents, a state court injunction, and explicit warnings from state authorities which alerted them, or should have alerted them, to the essentially fraudulent nature of the scheme. Accordingly, a jury could reasonably infer that Mentlick, Kraklio, Joan Webb, and Larry Webb carried out promotional activities, claims filing, and the collection of $300 fees after acquiring the requisite criminal intent. "One who knowingly participates in an ongoing mail fraud devised by another is guilty of mail fraud." Earles, 955 F.2d at 1177.

The Webbs and Kraklio complain that they directly participated in only a few of the forty-one substantive mail fraud counts. But each participant in a scheme to defraud is responsible for his partners' use of the mails in furtherance of that scheme. See Pinkerton v. United States, 328 U.S. 640, 647 (1946); United States v. Nance, 502 F.2d 615, 619 (8th Cir. 1974), cert. denied, 420 U.S. 926 (1975). These defendants also argue that many of the substantive counts involved innocent transactions, and that the counts based upon 80/20 claims involved mailings that did not defraud anyone.

However, there was evidence that a number of the 80/20 claims were later converted to paid claims, and further evidence that the 80/20 claims procedure was necessary to the scheme because We The People warned that anyone who did not file a claim could be prosecuted. Facially innocent mailings intended to further a scheme to defraud violate § 1341. See Schmuck v. United States, 489 U.S. 705, 715 (1989); United States v. Pemberton, 121 F.3d 1157, 1170-71 (8th Cir. 1997), cert. denied, 118 S. Ct. 1046 (1998).

B. Money Laundering. Mentlick, Kraklio, and the Webbs argue the government failed to prove they conspired to launder money in violation of 18 U.S.C. § 1956(h). To prove a conspiracy to launder money, the government must establish that a defendant knowingly joined a conspiracy to launder money and an overt act in furtherance of that conspiracy. See United States v. Conley, 37 F.3d 970, 976-77 (3d Cir. 1994). In Count 43, the government charged a conspiracy to violate two distinct money laundering statutes, 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i). Each requires proof that defendants engaged in financial transactions with the knowing use of the proceeds of illegal activities such as mail fraud. The final element of subsection (a)(1)(A)(i) requires proof of "intent to promote the carrying on" of unlawful activity such as mail fraud. We will refer to this as "reinvestment" money laundering. Subsection (a)(1)(B)(i) requires proof of intent "to conceal or disguise" the illegal proceeds, which we will refer to as "concealment" money laundering. See United States v. Nattier, 127 F.3d 655, 658-59 (8th Cir. 1997), cert. denied, 118 S. Ct. 1398 (1998). Here, the district court charged that the jury must find a conspiracy to commit both types of money laundering, and the jury did so. But the statute requires the government to prove reinvestment money laundering *or* concealment money laundering. In these circumstances, we need only examine whether the evidence was sufficient to convict of one type or the other. See United States v. Jackson, 935 F.2d 832, 842 (7th Cir. 1991). Because reinvestment money laundering carries a higher base offense level for sentencing purposes, see U.S.S.G. § 2S1.1(a), and because that was the base offense level used in sentencing these defendants, we must examine whether the

evidence was sufficient to convict them of conspiring to commit reinvestment money laundering.

The government located seven bank accounts operated by We The People. Over $1,100,000 was deposited into these accounts and almost $500,000 was withdrawn in cash. The deposits were primarily money orders in amounts around $300, and a number came from claimants processed by Kraklio and the Webbs. Although the government could not track the cash withdrawals, it introduced checks written on these accounts to pay for office supplies, secretarial services, and office staff wages. Checks written to Larry and Joan Webb, Kraklio, and Mentlick reimbursed claims writers for promotional expenses and paid claims writer commissions on fees collected from the fraud victims. From this evidence, the jury could reasonably find that these defendants knowingly participated in a conspiracy to deposit fraud proceeds into bank accounts and then to expend those proceeds to promote the on-going scheme to defraud. That is sufficient to convict them of conspiracy to commit reinvestment money laundering. See United States v. Cruz, 993 F.2d 164, 167 (8th Cir. 1993).

## II. Value of Funds Laundered for Sentencing Purposes.

When conspirators are convicted of fraud that includes money laundering, the Guideline provision imposing the more severe money laundering penalties, U.S.S.G. § 2S1.1, must be applied at sentencing. See United States v. Morris, 18 F.3d 562, 569 (8th Cir. 1994). That Guideline increases the base offense level depending on the value of the illegal proceeds that were laundered. See § 2S1.1(b)(2). Here, the probation officer recommended, and the district court agreed, that the value determinations should be based upon the jury's money laundering forfeiture verdicts against each defendant.[1] The government appeals these determinations, arguing that they significantly

---

[1]The forfeiture verdicts against these defendants ranged from $45,000 for Joan Webb to $500,000 for Allen Zurcher.

understated the value of money laundered by all defendants except Hildebrand. This is a complex and difficult sentencing issue.

The government proposes a relatively simple answer -- (1) fix the amount of the loss for fraud sentencing purposes, <u>see</u> U.S.S.G. § 2F1.1(b)(1), as the full $300 fee collected from each victim because the conspirators never intended to file claims; (2) group the fraud and money laundering counts under U.S.S.G. § 3D1.2(d); (3) with the offenses grouped, determine the value of money laundered for purposes of § 2S1.1(b)(2) as equal to the amount of the fraud loss; (4) conclude that all claim fees collected by We The People were reasonably foreseeable relevant conduct for each defendant, <u>see</u> U.S.S.G. § 1B1.3; and therefore (5) base each defendant's money laundering sentence on the total amount of claim fees the government proved the conspiracy collected, namely, $1,352,736. We reject this contention because points (3) and (4) are unsound as a matter of law.

Fraud sentences are based on the amount of loss to victims. Money laundering sentences are based on the value of the money laundered. While both measures address the relative scope of the illegal activity, they do not measure the same types of harm. And because the base offense levels for money laundering are much higher than the base offense level for fraud, <u>compare</u> § 2S1.1(a), <u>with</u> § 2F1.1(a), it is wrong to assume that the Sentencing Commission intended to equate the amount of fraud loss with the value of money laundered for every fraudulent scheme that includes some form of money laundering (as most every fraud scheme does). Therefore, we agree with decisions holding that fraud and money laundering counts are not so closely related *as to permit loss and value grouping under § 3D1.2(d).* <u>See</u> <u>United States v. Taylor</u>, 984 F.2d 298, 303 (9th Cir. 1993); <u>United States v. Johnson</u>, 971 F.2d 562, 575-76 (10th Cir. 1992).[2]

---

[2]Of course, if a sentencing court finds that all fraud proceeds were laundered, then the amount of fraud loss and the value of money laundered will be the same for sentencing purposes. That was the situation in <u>United States v. Mullens</u>, 65 F.3d 1560, 1564-65 (11th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1112 (1996), and <u>United States v.</u>

Rather than simply equating fraud loss with value of money laundered, as the government urges, a sentencing court must separately determine the value of laundered proceeds attributable to each conspirator. There are two factors that complicate this task. First is the need to distinguish between different types of money laundering. Reinvestment money laundering offenses punish the plowing back of illegal proceeds into the unlawful scheme. Concealment money laundering offenses punish measures used to keep illegal proceeds from being detected. The former are punished more severely with an initial base offense level of 23, rather than 20, because reinvested proceeds generate further criminal activity. See U.S.S.G. § 2S1.1, comment. (backg'd). Just as the two offenses punish different types of conduct, the value of the money laundered must be measured differently. For example, when an elaborate fraud scheme includes a money laundering concealment device, it is likely that all proceeds have been concealed and will therefore count in the § 2S1.1(b)(2) value determination. But it is less likely that all illegal proceeds have been reinvested in an illegal enterprise because some may have been withdrawn, for example, for the conspirators' personal living expenses. Thus, when the government starts with the higher base offense level for reinvestment money laundering, it may encounter greater problems in proving the value of the illegal proceeds that were laundered.

The second complicating factor is to determine what was reasonably foreseeable relevant conduct for each money laundering conspirator. A relatively peripheral conspirator may know more about the fraud scheme than he or she knows about the reinvestment money laundering offense. Because fraud and money laundering may not be grouped for purposes of § 2S1.1(b)(2), the government must prove reasonable foreseeability specifically as to the money laundering. This can raise intriguing questions; for example, when Hildebrand paid Larry Webb his claim writer's

---

Rose, 20 F.3d 367, 372 (9th Cir. 1994), cases on which the government relies.

-11-

commissions, were those payments a reinvestment of illegal proceeds as to Hildebrand but a personal withdrawal as to Webb?

In this case, the government came to sentencing with a global approach to this issue that we reject. Not surprisingly, therefore, the government did not place in the sentencing record the kind of detailed evidence on the value-of-money-laundered issue that would support its contention that each defendant should be assessed the value of all fraud proceeds under § 2S1.1(b)(2). The district court recognized it was not bound by the jury's criminal forfeiture verdicts and concluded they were a reasonable estimation of the value of money laundered attributable to each conspirator. The government has failed to persuade us that the resulting findings were clearly erroneous.

### III. Jury Instruction Issues.

A. Deliberate Ignorance Instruction. Mentlick, Gardemann, Kraklio, and the Webbs argue the district court erred in giving a deliberate ignorance or willful blindness instruction consistent with Eighth Circuit Model Criminal Jury Instruction 7.04:

> You may find that a defendant acted knowingly if you find beyond a reasonable doubt that the defendant was aware of a high probability that materially false representations were being made about the Baskerville case or the claims process, but deliberately avoided learning the truth. The element of knowledge may be inferred if a defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her.

A deliberate ignorance instruction is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance. United States v. Gruenberg, 989 F.2d 971, 974 (8th Cir.), cert. denied, 510 U.S. 873 (1993). In deciding whether this instruction was warranted, we view the evidence in the light most favorable to the government and reverse if the district court abused "its

-12-

wide discretion to formulate jury instructions." United States v. Cunningham, 83 F.3d 218, 221 (8th Cir. 1996).

Iowa Assistant Attorney General Steven Reno testified that in September 1993 his office obtained an order from the Wayne County District Court enjoining collection of the $300 claim fees. Hildebrand, Zurcher, Kraklio, and the Webbs were personally served with copies of that order. In December 1993, Reno attended a promotional meeting and told Kraklio and the Webbs they were misrepresenting the status of the Baskerville case and defrauding claimants. In January 1994, Reno attended another promotional meeting and told Gardemann and others the claims process was a scam. Gardemann bragged at a videotaped claims meeting in 1994 that "I've been called a scam artist in pretty nearly every state I've been in." An October 1994 search of Gardemann's storage unit revealed a notice from the Colorado Attorney General's Office disclosing the history of the Baskerville case and a copy of the Tenth Circuit's decision affirming its dismissal. A search of the Webbs' residence revealed a June 1993 Baskerville transcript confirming the case had been dismissed, documents from the proceedings in Wayne County, and newspaper clippings, including one titled "Judge Halts Alleged Farm Scam." Kraklio had documents from the Baskerville case and newspaper clippings, including one entitled "Attorney General Warns Fairfielders Not to Fall for Scam." Searches of Mentlick's home and office uncovered copies of the Baskerville docket sheets stating the case had been dismissed; newspaper clippings with headlines such as "Organization's Claims Hogwash," "I've Got This Bridge to Sell," and "Class Action Really a Scam, State Says"; and a notice from the Wisconsin Department of Justice stating, "There is absolutely no basis to these claims. They are outrageous misrepresentations being made to take money from unsuspecting citizens."

To be guilty of deliberate ignorance, "the defendant must have been presented with facts that put him on notice that criminal activity is probably afoot, and then the defendant must have failed to investigate those facts, thereby deliberately declining to verify or discover the criminal activity." United States v. Barnhart, 979 F.2d 647, 652

(8th Cir. 1992). Newspaper articles and contacts from state investigators alleging fraud are classic warning signs. See United States v. Camuti, 78 F.3d 738, 744 (1st Cir. 1996). Ignoring a state court restraining order and repeated accusations of fraud are far stronger evidence of deliberate ignorance or actual intent to defraud. Here, a reasonable jury could infer defendants knew they were engaged in fraud activities that were probably criminal and deliberately failed to investigate. The district court did not abuse its discretion in giving the deliberate ignorance instruction.

B. Freedom of Speech Instruction. Mentlick, Gardemann, and Kraklio argue the district court erred in refusing their proposed instruction that advised the jury of the First Amendment freedom of expression and instructed that, if the jurors found "the intent of a defendant or the tendency of his or her words was not to produce a lawless act, one likely to occur, you must find the defendant not guilty." These defendants argue that refusing this instruction denied them the defense that their actions were motivated by a political objective, namely, to overhaul the monetary system. However, they were charged with mail fraud and money laundering, not anti-government speech. Their speech was challenged only to the extent that they fraudulently solicited claims. "[W]here speech becomes an integral part of the crime, a First Amendment defense is foreclosed even if the prosecution rests on words alone." United States v. Freeman, 761 F.2d 549, 552 (9th Cir. 1985), cert. denied, 476 U.S. 1120 (1986); see United States v. Holecek, 739 F.2d 331, 335 (8th Cir. 1984), cert. denied, 469 U.S. 1218 (1985).

## IV. Alleged Prosecutorial Misconduct.

At trial, the government called Geraldine Sandein, who had performed secretarial work for defendants Gardemann and Zurcher. The following exchange took place during her direct examination:

Q: Did you bill Mr. Zurcher for the work that was done in connection with these items?

A: Yes.

Q: Do you still have those bills?

A: No, I do not.

Q: Where are they?

A: I don't know the answer to that. My office has been broken into several times, and those are no longer in my office.

Defendants objected and moved for a mistrial because the jury might infer they had committed the burglary to conceal their crimes. After speaking to counsel and the witness outside the presence of the jury, the court denied the motion but cautioned the jury, "There is not a shred of evidence that any of these Defendants had anything to do with any break-ins, and you cannot infer that." The court subsequently denied post-verdict motions for judgments of acquittal or a new trial on this ground. Defendants again raise the issue on appeal.

To warrant reversal, "the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Guerra, 113 F.3d 809, 815 (8th Cir. 1997), quoting United States v. Stands, 105 F.3d 1565, 1577 (8th Cir. 1997), cert. denied, 118 S. Ct. 120 (1997). The district court ruled that the prosecutor's conduct was improper because he intentionally elicited Ms. Sandein's testimony, he knew the jury might draw the prejudicial inference, he failed to seek the court's permission in advance, and therefore he "acted in bad faith in eliciting this testimony." We disagree. The prosecutor violated no order in limine in eliciting this testimony. It was relevant to explain why the invoices in question were

-15-

not offered as trial exhibits. Even if the prosecutor believed the court might exclude this testimony as unduly prejudicial, it was not improper to ask the question during the course of the trial, when its relevancy and any offsetting prejudice could best be weighed, rather than to ask the court's permission in advance (though this tactic may of course risk a mistrial, depending upon the severity of the possible prejudice).

In addition to concluding that the prosecutor was not guilty of *improper* questioning, we agree with the district court that denial of a mistrial over this brief episode, accompanied as it was by a cautionary instruction that if anything was overly critical of the prosecution, did not deprive defendants of a fair trial.[3]

## V.  Other Issues Raised by Defendants.

A.  Acceptance of Responsibility.  Mentlick argues the district court erred in denying his request for a two-level reduction for acceptance of responsibility.  This adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse," except in rare circumstances such as "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt."  U.S.S.G. § 3E1.1, comment. (n.2).  Mentlick contends that his assertion of a First Amendment defense is such a rare circumstance.  We disagree.  His defense was that he lacked the requisite criminal intent, a denial of factual guilt.  Moreover, the record does not reflect that Mentlick has ever accepted responsibility for his offenses.

---

[3]Defendants also argue they are entitled to a new trial because the prosecutor was overly solicitous and flirtatious with the jury, coached witnesses, intentionally attempted to introduce exhibits without proper foundation, and made improper closing and rebuttal arguments.  After careful review of the record for plain error, we conclude these post-verdict contentions are without merit.

B. Upward Departure. Prior to sentencing, the government requested an upward departure based on Hildebrand's violation of a state court injunction and his misrepresentation that he was appointed a federal court receiver. See U.S.S.G. § 2F1.1, comment. (n.1). At the close of the sentencing hearing, the district court imposed a two-level upward departure for those reasons, and it sentenced Hildebrand at the top of his adjusted sentencing range of 151 to 188 months, explaining:

> I actually was not going to do an upward departure until I heard your allocution, and if you had come into this court with some kernel of remorse for having ruined people's lives, I wouldn't have departed upward, but all I heard is the same nonsense that I heard on the videotapes, and you bought yourself with your allocution an upward departure and you bought yourself a sentence at the high end of the Guideline range.

Hildebrand argues the district court interfered with his right to allocution by considering it in departing upward and in sentencing him at the top of the guideline range.

In selecting a point within the appropriate guideline range, or in deciding whether a departure is warranted, the sentencing court is entitled to "consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4. The purpose of the right to allocution is to give the defendant "the opportunity to present to the court his plea in mitigation." See Green v. United States, 365 U.S. 301, 304 (1961). It does not violate this right if the district court considers defendant's attitude, demeanor, and outrageous protestations of innocence in exercising its sentencing discretion. See United States v. Li, 115 F.3d 125, 134-35 (2nd Cir. 1997); United States v. Clemmons, 48 F.3d 1020, 1025-26 (7th Cir. 1995), overruled on other grounds by United States v. Allender, 62 F.3d 909 (7th Cir. 1995).

Hildebrand further argues he was not given advance notice that his allocution might serve as a basis for an upward departure, as <u>Burns v. United States</u>, 501 U.S. 129, 135 (1991), requires. At the start of the sentencing hearing, the district court gave notice it would consider an upward departure on the grounds urged by the government, and it expressly imposed the departure for those reasons. We do not read <u>Burns</u> as precluding the court from taking into account what was said at the sentencing hearing in making its final decision whether to depart.

C. <u>Miscellaneous Issues.</u> Mentlick contends the Northern District of Iowa jury-selection plan violated his constitutional right to a fair trial because his jury pool was selected from voter registration lists. This contention is foreclosed by cases such as <u>United States v. Einfeldt</u>, 138 F.3d 373, 379 (8th Cir.), <u>petition for cert. filed</u>, No. 97-9435 (June 8, 1998).

Defendants' remaining arguments were briefed pursuant to <u>Anders v. California</u>, 386 U.S. 738 (1967). Mentlick argues (1) United States courts have no jurisdiction because they are illegally sitting in admiralty; (2) the government failed to turn over evidence seized in violation of a Colorado court order; and (3) the district court and the jury violated their oaths to support the Constitution. Gardemann argues the claims process was not fraudulent as a matter of law. Larry and Joan Webb argue (1) the trial court lacked jurisdiction; (2) the government withheld evidence; (3) government witnesses committed perjury; and (4) defendants' conduct was not criminal because they were duty-bound to disclose government fraud. We have considered these arguments and conclude they are without merit.

## VI. The Government's Other Sentencing Issues.

A. <u>Minor Participant Role Reduction.</u> The government argues the district court erred in granting two-level reductions to Joan Webb, Larry Webb, and Zurcher for their minor roles in the criminal offense. <u>See</u> U.S.S.G. § 3B1.2(b). "The propriety of a

downward adjustment is determined by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable and by measuring each participant's individual acts and relative culpability against the elements of the offense." United States v. Belitz, 1998 WL 145916 *3 (8th Cir. 1998). The Webbs were not directly involved with the conspiracy's banking operations, and their claims writing activities were significantly less extensive than the other prosecuted claims writer, Kraklio. Zurcher was extensively involved in the group's banking affairs, but his efforts were largely ministerial, and he received very little compensation for his work. We conclude the district court's minor participant findings were not clearly erroneous. See United States v. Tran, 122 F.3d 670, 674 (8th Cir. 1997) (standard of review).

C. Downward Departure under U.S.S.G. § 5H1.1. Zurcher's guidelines sentencing range was fifty-one to sixty-three months. The district court departed downward and imposed a sentence of five years probation, with six months served in a community correctional facility followed by eighteen months of home confinement. The court invoked U.S.S.G. § 5H1.1, which provides that age, while not ordinarily relevant in determining whether to depart, "may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." The government argues the district court abused its discretion because it only made conclusory findings that Zurcher's age and infirmity were present to an exceptional degree, and that home confinement would be equally efficient and less costly than incarceration.

Because age is a discouraged factor, departure is permissible "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Koon v. United States, 116 S. Ct. 2035, 2045 (1996). The district court specifically found that the seventy-year-old Zurcher has life-threatening health conditions. Although the government argues none of these

conditions show infirmity to an exceptional degree, "[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do." <u>Koon</u>, 116 S. Ct. at 2047. The government introduced no evidence showing that home confinement would not cost less than incarceration, and its expert testified that the Bureau of Prisons could manage Zurcher's conditions but admitted this would only be possible at certain facilities and would entail accommodations. Although this issue is close because we doubtless would have granted no downward departure or a far less generous departure, we conclude the district court did not abuse its departure discretion under <u>Koon</u>.

The judgments of the district court are affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.